IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CLAUDE R. SHORT,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )   CASE NO. 3:10-cv-350-MEF
                                    )
MANDO AMERICAN CORPORATION,         )   (WO – PUBLISH)
                                    )
        Defendant.                  )

## MEMORANDUM OPINION AND ORDER

The instant action arises from an employment relationship between Plaintiff

Claude R. Short ("Short") and Defendant Mando American Corporation ("MAC").  On

April 22, 2010, Short filed suit against MAC, alleging discrimination based on race and

national origin, harassment based on age and race, retaliation, and several state law torts.

(Doc. # 1).[1]  This case is now before the Court on five motions, which are as follows:

(1)     MAC's motion for summary judgment, (Doc. # 43), filed on April 22, 2011;

(2)     Short's motion for a protective order and motion to strike MAC's motion
        for summary judgment, (Doc. # 49), filed on May 2, 2011;

(3)     MAC's motion to strike portions of Short's evidentiary submission in
        opposition to MAC's motion for summary judgment, (Doc. # 59), filed on
        May 25, 2011;

(4)     Short's motion to strike the affidavit of Jerry Rolison, (Doc. # 63), filed on
        June 16, 2011; and

---

[1]  In the pre-trial hearing held on July 22, 2009, counsel for Short conceded and
abandoned the claims of racial harassment, unequal pay, and age discrimination, harassment, and
retaliation.  Thus, the only remaining claims are for race discrimination, national origin
discrimination, retaliation, and the state-law torts.

(5)     Short's motion to strike the affidavit of Taeyoung Kwak, (Doc. # 64), filed
on June 16, 2011.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §§

1331 (federal law) and 1367(a) (supplemental jurisdiction).  Venue is proper in this

district pursuant to § 1391(b).  The parties do not dispute personal jurisdiction.

## FACTS AND PROCEDURAL HISTORY

I.      Facts

A.      The Parties Generally

Short is a white male, originating from the United States.  He is a resident of

Bumpus Mills, Tennessee.  Prior to working for MAC, Short worked for General Motors

("GM") for thirty-four years.

Although it is unclear in which state MAC is incorporated, the parties agree that

MAC was incorporated in the United States in January of 1996.  MAC is a wholly-owned

subsidiary of Mando Corporation, which is incorporated and existing under the laws of

the Republic of Korea.  At all relevant times, MAC was doing business in Lee County,

Alabama.  MAC and Korean subsidiary corporations of Mando Corporation are in the

business of manufacturing, assembling, and selling automotive partes and assemblies to

customers in the United States and other world-wide markets.  In 2004, MAC commenced

operations at its plant in Opelika, Alabama, creating products used in the manufacture of

2

automobiles.  MAC's primary customers are the "Big Three" automobile manufacturers in the United States (GM, Chrysler, and Ford) located in Detroit, Michigan, Hyundai Motors Manufacturing located in Montgomery, Alabama, and Kia Motors Manufacturing located in West Point, Georgia.  MAC also has a facility in Plymouth, Michigan, near Detroit.

MAC has two types of employees at its Opelika plant.  "Regular" employees reside permanently in the United States and are hired by and work directly for MAC.  Regular employees are predominately American in origin.  Regular employees are employees only of MAC.  Foreign Service, or "expatriate", employees ("FSEs") are employees of Mando Corporation, MAC's parent, sent from Korea to work in the United States for three to five years.  All FSEs are citizens of Korea.  Mando Corporation assigns FSEs to their positions so that its Korean employees can learn about overseas operations, educate subsidiaries about its business policies and methods, report on activities of the subsidiary to the parent corporation's management, and facilitate communications between the parent corporation, its Korean subsidiaries, MAC, and MAC's customers.

**B.      Short's Employment as Quality Director at MAC**

For approximately one year after MAC began operations at its Opelika plant in 2004, Nosuk Ha ("Ha"), a Korean citizen employed as an FSE by Mando Corporation, was the Quality Manager.  Prior to this time, Ha had worked as a Quality Director in MAC's Plymouth, Michigan facility.  Consequently, his five-year entitlement to work in

the United States was due to expire in 2008.

In July of 2006, MAC hired Short to replace Ha as the Quality Director at the Opelika plant with an annual salary of $125,000.  MAC hired Short because it believed that his English language skills and past work experience and relationships with the Big Three automotive companies would improve customer relations and quality control. MAC also believed that Short's experience as a Supplier Quality Supervisor and consultant with GM would help establish strong working relationships with GM and the other Big Three companies.  Initially, Short shared duties with Ha as Quality Director. However, soon after Short began working for MAC, Taeyoung Kwak ("Kwak") joined MAC as President.  Kwak originated from Korea but became a naturalized citizen of the United States.  Kwak shifted Ha to another position.  According to Short, Ha was responsible for supervising him.

As Quality Director, Short was "responsible for the total quality system within the plant, supplier quality and quality to deal with customers, [made] sure they [had] a good environment, [made] sure the employees [were] trained, [and] put the proper people in the proper place."  (Doc. # 45 Ex. 3, Short's Dep. 38:15–20).  Kwak testified that when he became MAC's President at the end of 2006, there was "no problem" with Short's performance of his duties.  (Doc. # 46 Ex. 1, Kwak Dep. 94:7–10).  On January 1, 2008, Kwak gave Short a $10,000 per-year (8%) increase in salary, although the normal increase that year was 4% for other managerial employees.

4

### *i.*     The Charge-Back Issue Generally

However, MAC contends that Short performed only some of his duties well.  MAC

concedes that Short performed well in his dealings with the Big Three American

automobile companies, but alleges that he "was not effective in his dealings with

suppliers, the majority of which were Korean-managed subsidiaries of Mando

Corporation in Korea and China."  (Doc. # 44, at 6).  Specifically, MAC contends that

Short was ineffective in implementing a new practice of "charge-backs" to its suppliers

for expenses incurred when component parts purchased from suppliers did not conform to

purchase specifications.  MAC alleges that Short, as Quality Director, was responsible for

establishing and implementing processes that identified and documented such

nonconforming components, communicating such identification and documentation to

responsible suppliers with MAC's claims for reimbursement, and following up with

suppliers, as necessary, to ensure that such charge-backs were honored by the suppliers.

Short disagrees, alleging that the Quality Department was separate and distinct

from the Accounting, Planning, and Purchasing Departments such that he "did not have

sole or even significant responsibility for any charge-back issues."  (Doc. # 55, at 11).

Short testified in his deposition as follows:

> The mounting charge back comes from shipping defective parts, so I had no
> responsibility in making those.  I had responsibility for trying to resolve that.
> And when I say that, I'm referring to trying to get support from the parent
> company to handle their quality issues and to sort their own stuff.

(Doc. # 45 Ex. 3, Short Dep. 95:3–10).  Short alleges that he requested that someone from

Mando Corporation come to Alabama to handle Mando Corporation's quality issues, but that his request "fell on deaf ears." (*Id.* 95:14–18). He was aware of the tensions that developed between Mando Corporation and MAC and its subsidiary corporations over the charge-back issue and knew that it was something to be concerned about from a business standpoint. (Doc. # 45 Ex. 3, Short Dep. 92:15–18, 99:10–15). Short further testified that he checked into the charge-back issue and "put [the documentation] into accounting to do the charge-backs" but that he told Kwak that he could not "get a report out of . . . accounting." (*Id.* 92:15–20). Short believed that he "had a responsibility to provide the data, submit it to accounting, and [that] it was accounting's responsibility to get the money back." (*Id.* 99:1–4).

Kwak testified in his deposition that Short was to submit the documentation for the charge-backs to accounting so that accounting could collect the funds, but he also testified that Short "need[ed] to follow through" with accounting or the supplier to make sure MAC was getting paid. (Doc. # 46 Ex. 1, Kwak Dep. 120:16–121:7). However, in his affidavit, Kwak stated that Short was responsible for documenting, communicating, and following up on charge-backs *with the suppliers*, not accounting. (Doc. # 45 Ex. 1, Kwak Aff. ¶ 18 ("As MAC's Quality Director, . . . Short was responsible for establishing and implementing processes that identified and documented such nonconformities, communicating such identification and documentation *to suppliers* with MAC's claims for reimbursement to responsible suppliers, and *following up with suppliers*, as necessary,

to insure that such claims, or "charge-backs," were honored by suppliers.") (emphasis added)).

### ii.     Short's Alleged Difficulties with Suppliers

Short testified that he does not speak Korean, nor did he attempt to learn how to speak or understand Korean.  (Doc. # 45 Ex. 3, Short Dep. 62:6–7, 64:12–14).  He further stated that "in staff meetings and business meetings, the Koreans would speak Korean, knowing that [the American employees] did not understand it."  (*Id.* 62:12–14).  Thus, Short felt that he was at a disadvantage in making presentations when in Korea using an interpreter.  (*Id.* 67:1–6; *see also* Doc. # 47 Ex. 5, Pl.'s Ans. to Interrogatories at 16).

In July of 2007, Kwak moved Jason Burton, the employee responsible for supplier quality, from Short's Quality Department to the Purchasing Department, which was headed by a Korean FSE named Kimbong Kim ("Kim").  Short testified that this change was made because "under many organizations supplier quality goes to the purchasing department because they procure material coming in and approve it" and because "that is how the [B]ig [T]hree . . . was organized."  (Doc. # 45 Ex. 3, Short Dep. 40:7–20).  In his affidavit, Kwak stated he moved supplier quality to the Purchasing Department because "it was evident to [him] that . . . Short was not effective in resolving the steadily increasing, unresolved charge-backs", he believed that "Kim's involvement would provide enhanced capacity for communication between MAC and its suppliers", and he "hoped that MAC's Purchasing Department's involvement would encourage MAC's

suppliers to be more willing to accept responsibility for MAC's charge-backs." (Doc. # 45 Ex. 1, Kwak Aff. ¶ 23).

MAC alleges that Short "continued to have overall responsibility for the identification of nonconforming parts received from Mando suppliers, including the accumulation of quality data used by MAC to seek recovery of costs and expenses from those suppliers, and the initiation of corrective action plans on quality issues." (*Id.* ¶ 24). Kwak also asserted that Short "remained in charge of the third-party companies involved in identifying and sorting nonconforming parts" and "continued to be responsible for the preparation and identification of 'debit memoranda' submitted to Mando [Corporation's] suppliers by MAC in support of MAC's charge-backs." (*Id.* ¶ 25). Short admitted that he would have responsibility, via those working under him, for the accumulation of data; however, he further stated that such information was provided to accounting and that he "expected accounting to go deduct the money from their payment and to get the money." (Doc. # 45 Ex. 3, Short Dep. 89:12–93:6). While MAC claims that Kim's involvement helped improve relationships with suppliers, many of its suppliers still refused to honor charge-backs due to inaccurate and incomplete data. (Doc. # 45 Ex. 1, Kwak Aff. ¶ 26).

### *iii.*   **Mando Corporation's Involvement in Late 2008**

By late 2008, the uncleared charge-backs had increased to several million dollars. (*Id.* ¶ 28). When Mando Corporation's executive leadership became aware of the issue in the summer of 2008, the Chairman of its Board of Directors ("Chairman Chung"), issued

directions to all of its subsidiaries, including MAC, to resolve the uncleared charge-backs. (*Id.*).  Despite efforts to clear the charge-backs, the issue remained unresolved in November of 2008, when Mando Corporation's directors were in Opelika for a meeting with MAC's Board of Directors.  (*Id.* ¶ 29).  Chairman Chung expressed unhappiness over the amount of uncleared charge-backs and the failure to cooperate between MAC and other Mando Corporation subsidiaries who supplied the parts.  (*Id.*).  Short admitted that Chairman Chung "continuously discussed with [him] the necessity of submitting claims and charge[-]backs in a timely manner."  (Doc. # 47 Ex. 5, Pl.'s Ans. to Interrogatories at 17).  However, Short explained that "this [information] was being turned into accounting on a monthly basis."  (*Id.* at 17–18; *see also* Doc. # 45 Ex. 3, Short Dep. 103:22–104:20).  Thus, Short felt that he was being unfairly accused of shortcomings in the clearance of charge-backs.  (Doc. # 45 Ex. 3, Short Dep. 105:9–13).

On December 8, 2008, Chairman Chung wrote a letter to all MAC management expressing his general dissatisfaction with MAC.  (Doc. # 47 Ex. 3, Def.'s Ex. 29 at 1).  Chairman Chung stated that MAC wrote off $12 million for 2006 and 2007 and had an additional $4.1 million at risk "due to [i]nventory adjustments, aging sales AR, missing assets, and aging quality AR claim[s]."  (*Id.*).  In pertinent part, Chairman Chung outlined the problems and solutions as follows:

> I think these issues were not caused by somebody outside but caused by MAC itself.  The main reason is lack of internal communication and teamwork. . . .
> Another significant reason is that MAC management lacks self desire

to succeed and direction.  I saw [the] same issues keep coming up.  This shows there is no desire to get better. . . .

Specifically, most of the operational issues were visible on the Planning / Accounting side.  As the MAC control tower, these groups need to pull other departments together to improve.   Yet, [the] Planning / Accounting department[s] had the most issues.

Communication and teamwork is the most important factor in doing your day[-]to[-]day work for Quality, Production, Control, Logistics, Procurement, and Purchasing.  But, due to lack of communication and teamwork, MAC has many issues with Mando [Corporation].  By improving internal communication and communication with Mando [Corporation], you need to eliminate the types of issues you are having with Mando [Corporation]. . . .

I want you to show me your desire to improve as well as [the] hard work to achieve that desire.  I will support you by dispatching Accounting, Planning, Purchasing, IT, QC, and HR.  With these people I am sending, I want you to fix the root cause of all the issues I discussed earlier and show me a direction where MAC can become a strong company.

(*Id.* at 1–3).  Short understood that the communication problems referred to by Chairman Chung included communications regarding the charge-back issue. (Doc. # 45 Ex. 3, Short Dep. 119:5–7).  However, he felt that the letter was "very insulting" when it "stat[ed] that [MAC management] had no desire to . . . improve."  (Doc. # 47 Ex. 5, Pl.'s Ans. to Interrogatories at 17).

The following day, on December 9, 2009, Kwak replied to Chairman Chung's letter, informing him that he "discussed the contents of [his] letter with . . . management" and that they "all agree[d] with everything [he] described."  (Doc. # 47 Ex. 3, Def.'s Ex. 30 at 1).  He assured Chairman Chung that MAC would "improve [its] relationship with Mando [Corporation]."  (*Id.*).  Kwak further stated that MAC was "in the process of realigning [its] organization to strengthen our operation management strength."  (*Id.*).

On December 12, 2008, Short sent a memorandum to the MAC employees and

managers under his supervision stating, in pertinent part, the following:

> A review of IQS[2] data reveals that information has been loaded into the system in a haphazard, hit-and-miss fashion.  This is very unfortunate; it must be corrected ASAP.
> Effective immediately, all new IQS reports must contain information that is appropriate to each blank space.  In other words, all blank spaces must be completed.  In addition, each employee must revisit his/her reports that have already been recorded in the system, and provide any missing information.  It is expected that this will be accomplished by January 15, 2009. . . .
> Please be diligent in completing these tasks.  This is imperative to the integrity of basic MANDO quality.

(Doc. # 47 Ex. 7, Def.'s Ex. 111 at 1).  Short testified that the IQS information could refer

to supplier parts as well as internal complaints and that some of this data could be used

for charge-backs.  (Doc. # 45 Ex. 3, Short Dep. 109:5–8, 110:2–4).  He sent out the

memorandum "[b]ecause there [were] a lot of quality people that reported under my

direction in the plants that [were] providing data in the system" and because "information

wasn't being completed in the IQS system, and [they] wanted it resolved."  (*Id.*

109:2–17).

Donald Laking ("Laking"), a MAC employee who was general manager of

suspension, testified that, after Short's memorandum was sent out, "there was a fire alarm

that [the IQS] data had to be corrected because evidently it was not accurate enough."

(Doc. # 47, Laking Dep. 19:7–10, 51:16–19).  Laking further testified that, while it was

---

[2] "IQS" is a "computer program database where [Quality Department employees] would log in [their] concerns . . . [and] complaints with information."  (Doc. # 45 Ex. 3, Short Dep. 108:19–22).

11

only a small portion of data that needed to be fixed on his part because his major supplier did not have many charge-backs, he "had to try to pull what information [he] had to verify [that] small portion of those charge[-]backs." (*Id.* 52:2–22).

### C.   Short Becomes the Director of Customer Service and Warranty in December of 2008

According to Kwak, in response to Chairman Chung's concerns, he decided to remove Short as Quality Director. (Doc. # 45 Ex. 1, Kwak Aff. ¶ 36). He informed Short of this decision on December 17, 2008. According to Short, Kwak told him that "headquarters[3] wanted to replace him with a Korean." (Doc. # 45 Ex. 3, Short Dep. 123:16–18). When Short asked to whom he would be reporting, Kwak allegedly stated "that he didn't know, but it would be a Korean." (*Id.* 124:19–21). On the other hand, Kwak testified that he told Short that he was being removed as Quality Director because "headquarters wants somebody who can communicate and work with Korea" but that he did not know yet who that would be. (Doc. # 46 Ex. 1, Kwak Dep. 81:4–12, 82:14–23). He further testified that he did not think it was necessary that the Quality Director actually be Korean. (*Id.* 84:16–19). Kwak also stated that he thought he told Short that "there were issues in communicating with headquarters and there were issues with charge[-]backs and that's why . . . headquarters is not happy with the performance of [the] quality department." (*Id.* 90:23–91:4).

---

[3] Short understood "headquarters" as referring to Chairman Chung and the people from Mando Corporation in Korea. (Doc. # 45 Ex. 3, Short Dep. 125:10–15).

Kwak told Short that he would become the Director of Customer Service and Warranty with responsibility over MAC's Big Three customers. (*Id.*). As a result of this change, Short's responsibilities were reduced. (Doc. # 46 Ex. 1, Kwak Dep. 89:22–90:8). Kwak also informed Short that his pay would also be reduced due to his lessened responsibilities. (Doc. # 45 Ex. 3, Short Dep. 153:11–15). Kwak then placed Ha in charge of Quality Control as its Quality Control/Production Engineering General Manager. (Doc. # 45 Ex. 1, Kwak Aff. ¶ 36). Thus, Ha had "management authority over most of the quality control efforts previously managed by . . . Short, including supplier quality, operations quality, customer service for Hyundai and Kia, and production engineering." (*Id.*).

Furthermore, Kwak told Short that he would be transferred to Plymouth, Michigan for the Director of Customer Service and Warranty position. Short informed Kwak that he did not want to move to Michigan and requested that he be able to work out of his vacation home in Tennessee. According to Kwak, he "had misgivings about . . . Short's ability to provide direction and supervision from a remote vacation home." (*Id.* ¶ 40). On January 5, 2009, Kwak told Short that he would be reporting to Ha. Short claims that he "informed [Kwak] that [his] demotion wasn't because of performance but because they wanted a Korean rather than an American to be in the top spot." (Doc. # 45 Ex. 3, Short Dep. 55:3–7). Kwak also told Short to ask Ha if he could work out of Tennessee. Ha gave his permission the following day, and Kwak testified that he was willing to "give it a

13

try." (Doc. # 45 Ex. 1, Kwak Aff. ¶ 40).  Short immediately began making preparations to relocate to Tennessee.

### D.    The Economic Downturn in Early 2009

In early 2009, the automotive industry in the United States began to decline.  One of MAC's major customers, GM, filed for bankruptcy protection and "MAC was operating at a small fraction of what its production had been in 2008."  (Doc. # 45 Ex. 1, Kwak Aff. ¶ 43).  As a result of this economic downturn, Kwak made an across-the-board reduction of 4% of the salaries of all General Managers and above, determined that there would be no annual raise for all other salaried employees, implemented a salary / wage freeze for all employees, laid off 43 of its hourly employees, and operated only during alternate weeks for several months.  (*Id.* ¶¶ 42–43).  On March 1, 2009, Kwak reduced Short's salary to $96,000 annually "due in large part to [the] substantial reduction in job duties and responsibilities, but also due to [the] across-the-board reduction of 4% of the salaries."  (*Id.* ¶ 42).  Kwak asserted that he did not reduce Short's salary when he began his new position because he "waited until [he] decided on company-wide reductions as a result of the severe economic downturn in the automotive sector in 2009."  (*Id.*).

Also as a result of this economic downturn, MAC eliminated as many costs unrelated to production as possible.  (*Id.* ¶ 44).  Thus, Kwak directed that there would be no expenditures authorized except those required to meet production needs.  (*Id.*).[4]  On

---

[4]  For example, "travel was minimized to 'absolute need,' lighting was adjusted (either turned off or disconnected), color copies were eliminated, office coffee was eliminated,

January 22, 2009, Kwak issued a memorandum to "all hands" which was emailed to

MAC employees and which stated the following:

> Effective immediately all purchases that are not related to daily production will be sent back to the department unpaid if the accounting department does not have a prior approval form on file for said purchases.  This includes but is not limited to: office supplies, janitorial supplies, personal expenses turned in on expense reports, credit card purchases, and any other category that is not directly involved with production.

(Doc. # 47 Ex. 3, Def.'s Ex 114 at 1).

As Director of Customer Service and Warranty, Short acknowledged that "this job

required travel to various customer locations, in order to perform [the] job well."  (Doc. #

47 Ex. 5, Pl.'s Ans. to Interrogatories at 16).  However, because Ha refused to approve

most of his travel requests, Short contends that his performance of these duties was

undermined.  (*Id.*).  Both parties acknowledge that tensions arose between Short and Ha

over the refusal to approve his travel requests.  According to MAC, it was due to the

economic downturn that Short "was often unable to travel from . . . Tennessee to

[MAC's] offices in Plymouth, Michigan, and customer locations because the expense of

such travel could not be authorized."  (Doc. # 45 Ex. 1, Kwak Aff. ¶ 46).  Short

acknowledged that he was aware that the country and the automotive industry, in

particular, were hurting very badly during this time period and that he was not surprised

when MAC management decided that cut backs were needed.  (Doc. # 45 Ex. 3, Short

---

cardboard was recycled for use, there was no hiring, and 401(k) matching was halted."  (Doc. # 45 Ex. 1, Kwak Aff. ¶ 44).

Dep. 148:4–19).  He knew that there were "financial issues" and that "cash was tight."
(*Id.* 141:19–22).  However, both Kwak and Ha testified that, even if Short was based out
of Plymouth, Michigan, he would still need to make occasional trips to other locations,
such as Canada, Mexico, and Louisiana, where customer plants were located.  (Doc. # 46
Ex. 1, Kwak Dep. 141:5–142; Doc. # 46 Ex. 2, Ha Dep. 80:21–81:1).

### E.     The Decision to Transfer Short to Michigan

While Short was attempting to work out of Tennessee, MAC continued to look for
ways to cut costs.  (Doc. # 45 Ex. 1, Kwak Aff. ¶ 47).  In June of 2009, Ha suggested to
Kwak that Short be assigned the work performed by Vince D'Epifanio ("D'Epifanio"), a
MAC contract employee in the Detroit, Michigan area who was responsible for "drop-
ship" supplier quality.[5]  (*Id.* ¶ 49).  By terminating D'Epifanio's employment and
assigning his work to Short, Kwak believed that MAC would save $70,000 a year—*i.e.*
the cost of having D'Epifanio as a contractor—without compromising MAC's operations.
(*Id.*).

After Ha informed Short of this decision on June 18, 2009, Short emailed him the
following day.  (Doc. # 47 Ex. 3, Def.'s Ex. 36 at 1).  Short reiterated the alleged
conversation with Kwak regarding headquarters wanting a Korean in the Quality Director
Position.  He wrote that his demotion in January of 2009 was "not a performance issue"
but rather that headquarters "wanted a Korean person to fill that top spot in the company's

---

[5]  "Drop shipments" refers to parts and assemblies that are shipped directly from MAC's
suppliers to MAC's customers.

organization." (*Id.*).  Short asked Ha why he was being demoted again. (*Id.*).  This email

was also sent to Kwak and Human Resources Manager Jerry Rolison ("Rolison").[6] (*Id.*).

Ha responded with an email sent on June 24, 2009.  (Doc. # 47 Ex. 3, Def.'s Ex.

38).  He told Short that "the job changes [he] proposed to [Short] stem from current

business conditions and needs and is not associated with [Short's] performance while

working with [MAC]." (*Id.*).  Ha further stated that he wanted Short to continue with

MAC "as [MAC] struggle[s] to emerge from this economic downturn to make a better

company than ever before." (*Id.*).  Additionally, he informed Short that he would need to

be based out of Plymouth, Michigan "to be successful in this proposed role." (*Id.*).

According to Ha, being located in Plymouth, Michigan would enable Short "to better

service [MAC's] customers and suppliers more timely and economically" because "the

bulk of these contact points and locations are regional to Plymouth." (*Id.*).  Ha concluded

by telling Short that there were "no plans to reduce [Short's] salary, . . . title or benefits[;]

just to change [his] job description, and base location." (*Id.*).

The following day, Short emailed Ha and stated that he personally believed that he

could be "very successful" in this new position by working out of his Tennessee home

and that it "would be more cost effective" for him to stay in Tennessee rather than have

---

[6] As the Human Resources Manager, Rolison was responsible for performing and
overseeing generalized human resources functions, such as administering MAC's policies and
benefits; training newly hired employees; investigating employee concerns; and recommending
and implementing appropriate discipline for violation of policies." (Doc. # 45 Ex. 2, Rolison
Aff. ¶ 2).

MAC pay his relocation costs.  (Doc. # 56 Ex. 2, Pl.'s Ex. 21 at 1).  He pointed out that, out of the four drop ship suppliers, only one is located in Michigan and that the customers supplied by these drop shipments are found in Alabama, Louisiana, Michigan, and Canada.  (*Id.*).  However, Short stated that he would "take [Ha] at his word" regarding whether he would be of better service to MAC's drop ship customers in Plymouth, Michigan.  (*Id.*).  Finally, he asked for extra information in order to "tie up loose ends" in Tennessee, including when the relocation would occur, whether MAC would cover living expenses in Michigan until his Tennessee home is sold and until he finds a new home in Michigan, and whether MAC would move his furniture and belongings to Michigan.  (*Id.*).  Finally, he requested a long-term employment agreement with MAC in regards to the relocation.  (*Id.*).

On July 9, 2009, Rolison responded to Short's requests for more information regarding the move to Michigan.  (Doc. # 56 Ex. 2, Pl.'s Ex. 23 at 1–2).  He told Short that MAC wanted him working out of the Plymouth, Michigan office within one to two weeks with a full relocation target date no later than September 14, 2009.  He also informed Short that the "standard relocation package is to provide a lump sum payment equal to 10% of [Short's] salary for miscellaneous moving expenses in addition to providing a moving company to relocate [his] household belongings."  (*Id.* at 2).  However, he also stated that it would be Short's "choice in selecting and listing [his] home with a realtor."  (*Id.*).  As for the long-term employment agreement, Rolison stated

that MAC "follows a general policy of 'employment at will'" such that only the President "has the authority to enter into any agreement with any individual for employment for a specified period of time." (*Id.*). Rolison told Short that he "appreciate[d] [his] cooperation and sincerely hope that [he] will accept this change and continue to help [MAC] be successful." (*Id.*). He asked that Short provide his decision by July 16, 2009. (*Id.*).

On July 15, 2009, Short responded to Rolison's email. (Doc. # 47 Ex. 3, Def.'s Ex. 46). According to Short, this and other emails evidenced that he repeatedly and affirmatively "accepted" the new position. (Doc. # 55, at 18). In the email, Short stated that he had put in travel requests to Ha and that, if they were approved, he could begin working out of Plymouth, Michigan the following week. (Doc. # 47 Ex. 3, Def.'s Ex. 46 at 1). However, he stated that he could not currently afford to buy or rent another home in Michigan until he sells and closes on his Tennessee home and requested that MAC "be patient with [him] as [he] work[s] through this [relocation] process." (*Id.*). Short further objected to the 10% lump sum payment because it would be his "third relocation in less than three years" and "will cost more than the lump sum payment for [him] to break even." (*Id.*). He stated that he was now "being asked to move at the risk of financial hardship, in order to keep a lesser paying . . . and less prestigious . . . position." (*Id.*). As for the long-term employment agreement, Short told Rolison that he was "willing to negotiate that with . . . Kwak, since he, alone[,] has the power to do so." (*Id.* at 2). He

19

requested a three-year employment agreement with standard benefits, a guarantee that MAC would not further reduce his salary, a company vehicle of the same class and size as he currently had, assurances that he would get normal pay increases as the other salaried employees receive them, and a promise that he would not have to move again.  (*Id.*).

On July 21, 2009, Short emailed Ha and Jason Burton ("Burton"), another MAC employee, stating that he had "never been given the 'go ahead' to begin the process of transition to handling the drop ship suppliers."  (Doc. # 47 Ex. 3, Def.'s Ex. 52 at 1).  He asked if D'Epifanio had been notified of his termination yet and how MAC wanted him to proceed.  (*Id.*).  Burton replied a few minutes later stating that D'Epifanio had been notified, but that he was not sure about how to proceed with the transition.  (Doc. # 47 Ex. 3, Def.'s Ex. 53 at 1).  He further stated that "time is running out."  (*Id.*).  Later that same day, Rolison acknowledged Short's efforts and willingness to relocate to Michigan but stated that MAC "cannot accept the terms of [his] relocation" as he had requested.  (Doc. # 47 Ex. 3, Def.'s Ex. 55 at 1).  Rolison stated, in pertinent part, the following:

> During the most recent restructuring of the QC department, we felt that we could offer you continued employment in Michigan as a replacement for an independent contractor along with other enhanced responsibilities in the Quality field.  However, the relocation terms that you requested beyond what we proposed to you indicate that you cannot meet our immediate needs under the terms [MAC] presented to you; therefore, we believe there are only 2 options.
>
> Option 1: Accept the new position based in the Plymouth office with the terms we presented; or
> Option 2:  It may be in the best interests of both parties if we release you from [MAC's] employment effective Friday, July 31, 2009.

20

Please get back to me within 24 hours with your final decision and I hope we can continue the working relationship. . . .

We sincerely hope you select option 1; however, should you select option 2, it has been a pleasure knowing and working with you.

(*Id.*).

The following day, July 22, 2009, Short emailed Rolison, Kwak, and Ha, stating that there was a "misunderstanding" because he "had already accepted the position." (Doc. # 47 Ex. 3, Def.'s Ex. 56 at 1).  He stated that he was still waiting on Ha to approve travel requests to Michigan for him to begin the relocation process.  (*Id.*).  Short further stated the following:

> I am attempting to accept the position, but I feel that [MAC] is not living up to the conditions set forth in [Rolison's July 9, 2009] email, or I would already be involved in the transition to the Plymouth, Michigan office.
> In order to be perfectly clear, let me state that I am accepting option no. 1 of your email dated 7/21/09 . . . : the position in Plymouth, Michigan with the terms you have presented. . . .
> Please be aware that it appears that you have misunderstood my requests in my email dated 7/25/09.  You called them "demands" but I am simply attempting to communicate my needs.  This will be my second move on behalf of MAC in one year.  As mentioned above, I cannot afford another home or apartment at this time; therefore, I was requesting additional relocation assistance to minimize my financial loss.  Also, I need some assurance that I will not sell my home in Tennessee and move to Michigan, only to be terminated and left in that location.  For this reason, I made the statement that I <u>need</u> a three-year contract of employment, not that I <u>demand</u> a contract. . . .  I am requesting some assurance that I will be able to count on the ability to support my family and myself.

(*Id.*).  That same day, Short signed his charge of discrimination for the Equal Employment Opportunity Commission ("EEOC") although he did not file it until July 30,

2009.  Short also states that he told Rolison that he believed Kwak "was trying to force [him] out" of MAC and "would have [Rolison] fire" him.  (Doc. # 45 Ex. 3, Short Dep. 189:17–19).  Short also states that he spoke to Rolison and others about his filing of an EEOC charge.  (*Id.* 212:3–213:19).

On July 24, 2009, after Short again emailed Ha regarding the travel requests for Michigan, Ha approved his request to travel to Michigan the following week for "house hunting" purposes. (Doc. # 47 Ex. 3, Def.'s Ex. 57, 59).  However, on July 30, 2009, Rolison emailed Short and told him that, "[t]hereafter, all temporary and permanent living arrangements in Michigan will be at [his] expense."  (Doc. # 47 Ex. 3, Def.'s Ex. 60 at 1). He reiterated that Short would receive a $10,000 payment to assist with these and other miscellaneous moving expenses and that MAC would pay to move his belongings from Tennessee to Michigan.  (*Id.*).  Rolison also expressed his pleasure that Short "accepted the position in Michigan."  (*Id.*). He further stated that, because D'Epifanio's employment had already been terminated, it was "critical that [Short] transition into [his] new position immediately" and requested that Short begin to operate out of the Michigan offices by August 13, 2009.  (*Id.*).

The following day, on July 31, 2009, Short responded to Rolison, Ha, and Kwak stating that he could not understand why MAC's proposals "keep changing."  (Doc. # 47 Ex. 3, Def.'s Ex. 61 at 1).  He believed that MAC had changed the permanent relocation date of September 14, 2009 to August 13, 2009.  He also stated that the July 9, 2009

email indicated that MAC "would absorb the business expenses of any approved travel requirements" until September 14, 2009, but that MAC is now "expecting [him] to cover all expenses." (*Id.*). He further stated that the time frame for the approved travel did not give him enough time to get up to speed with his new position and house hunt. (*Id.*). Short again reiterated that he "cannot afford to pay, rent, or buy a home until [his] Tennessee home sells and closes" and that the $10,000 relocation payment "will only cover a small portion fo the costs for relocation." (*Id.*). Short concluded by stating that he was "ready and willing to work in Michigan" but that he needed "<u>fair</u> and consistent direction in order to make this transition." (*Id.*) (emphasis in original).

### F.    Short's Employment with MAC Ends

According to Kwak, "it was evident to [him] that . . . Short was not agreeable to the relocation package that [he] had offered." (Doc. # 45 Ex. 1, Kwak Aff. ¶ 59). After receiving Short's emails on July 30 and 31, 2009, Kwak "concluded that he was not willing to accept [MAC's] offer of continued employment and instructed . . . Rolison to advise him that his employment had ended." (*Id.*). On August 3, 2009, Rolison informed Short via telephone that his employment had been terminated, effective July 31, 2009. (Doc. # 45 Ex. 2, Rolison Aff. ¶ 53). Rolison reiterated this decision in an email to Short on August 7, 2009, in which he stated that the parties "were unsuccessful in reaching a mutually acceptable relocation package." (Doc. # 47 Ex. 3, Def.'s Ex. 64 at 1). After Short left MAC, he was replaced as Director of Customer Service and Warranty by Will

Trent ("Trent"), who is a white male of American national origin.

## II.      Procedural History

Short filed the instant action on April 22, 2010 alleging discrimination based on age, race, and national origin as well as retaliation and several state law torts.  (Doc. # 1).

Specifically, the Complaint alleges seven Counts as follows:

| | | |
|---|---|---|
| Count 1: | Age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, *et seq.*; |
| Count 2: | Age discrimination and harassment in violation of the Alabama Age Discrimination in Employment Act ("AADEA"), as amended, Ala. Code §§ 25-1-20, *et seq.* (1975); |
| Count 3: | Racial discrimination and harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, *et seq.*, as well as 42 U.S.C. § 1981; |
| Count 4: | Discrimination based on national origin in violation of Title VII and § 1981; |
| Count 5: | Retaliation, apparently in violation of the ADEA, Title VII, and § 1981;[7] |
| Count 6: | Intentional infliction of emotional distress in violation of Alabama law; and |
| Count 7: | Negligent and wanton hiring, training, supervision, and retention in violation of Alabama law. |

(Doc. # 1, at 5–13).  At all times relevant to this action, MAC was an "employer" within

---

[7] Count 5 does not explicitly state under which statutes Short claims retaliation; however, his Equal Employment Opportunity Commission charges allege discrimination based on race, age, and national origin as well as retaliation.  Presumably, these retaliation claims would fall under Title VII (for race and national origin), § 1981 (for race), and the ADEA (for age).

the meaning of the ADEA, Title VII, and § 1981. In the pre-trial hearing held on July 22, 2009, counsel for Short conceded and abandoned the claims of age discrimination, harassment, and retaliation, racial harassment, and unequal pay.  Thus, the remaining claims are for race discrimination, national origin discrimination, retaliation under Title VII and § 1981, and the state-law torts.

On April 22, 2009, MAC moved for summary judgment, arguing that it is entitled to judgment as a matter of law on all of Short's claims. (Doc. # 43).  In response, Short filed a motion for a protective order and a motion to strike the summary judgment motion on May 2, 2011, arguing that MAC failed to properly plead an affirmative defense and failed to properly turn over evidence during discovery.  (Doc. # 49).  Short also moved to strike Kwak's affidavit and Rolison's affidavit, (Docs. # 63, 64), on June 16, 2011.  MAC moved to strike portions of Short's evidentiary submission on May 25, 2011.  (Doc. # 59). All of these motions are currently pending before this Court.

## THE MOTIONS TO STRIKE

### I.    The Motion for a Protective Order and to Strike MAC's Summary Judgment Motion (Doc. # 49).

Short urges this Court to strike MAC's entire summary judgment motion because MAC failed to properly produce evidence during discovery pursuant to Rule 26 of the Federal Rules of Civil Procedure and has failed to properly plead an affirmative defense. (Doc. # 49).  Both of these claims stem from MAC's assertion that a treaty between the United States and Korea permits countries of each nation to employ "executive

personnel", "technical experts", and "other specialists" of their own choice in the other country. Treaty of Friendship, Commerce, & Navigation, U.S.-Korea, Art. VIII, Nov. 7, 1957, 8 U.S.T. 2217 (the "FCN Treaty"). In the alternative, Short seeks to strike the documents and argument relying on this new defense. (Doc. # 49, at 2).

### A.    Short has Not Established that MAC was Required to Produce the FCN Treaty During Discovery

Under Rule 26 of the Federal Rules of Civil Procedure, parties must, without awaiting a discovery request, provide "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). A party must supplement such disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Id.* 26(e)(1)(A). Thus, Short apparently argues that the FCN Treaty is such a "document" that has not been properly disclosed under Rule 26(a). (Doc. # 49, at 2–3). However, Short has failed to provide any legal precedent for the notion that a treaty—which is the "[s]upreme [l]aw of the [l]and", U.S. Const., art. VI, cl. 2—is evidence that must be disclosed under Rule 26(a). Indeed, as MAC points out, requiring disclosure of law such as a treaty would subject "every court decision, legislative act, and regulation supporting a litigant's

position" to discovery.  (Doc. # 52, at 5).  *See, e.g.*, *Keogh v. Pearson*, 35 F.R.D. 20, 23

(D.D.C. 1964) (holding that defendant was not required to turn over newspaper columns

that were not "under the exclusive control of defendant" but were "readily available" to

both parties because the plaintiff "cannot expect defendant to do his work for him").

Additionally, this Court is satisfied that MAC was not required to disclose the existence

of the FCN Treaty under the interrogatories identified by Short in his motion to strike.  As

such, this Court finds that Short has failed to establish that MAC was required to disclose

the existence of the FCN Treaty during discovery.

### B.    The FCN Treaty is Not an Affirmative Defense

Rule 8(c) of the Federal Rules of Civil Procedure requires a party, when

responding to a pleading, to "affirmatively state any avoidance or affirmative defense."

Fed. R. Civ. P. 8(c).  Rule 8(c) is designed to "guarantee that the opposing party has

notice of any additional issue that may be raised at trial so that he or she is prepared to

properly litigate it."  *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988).

Thus, "[f]ailure to plead an affirmative defense generally results in a waiver of that

defense."  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010).  As the

Eleventh Circuit has explained:

> An affirmative defense has been described as "any matter that does not tend
> to controvert the opposing party's prima facie case as determined by the
> applicable substantive law." 2A J. Moore, Moore's Federal Practice ¶ 8.27[3]
> (2d ed. 1985).  In determining whether a particular argument is an affirmative
> defense, courts consider "the logical relationship between the defense and the
> cause of action," and the likelihood that the plaintiff will be unfairly surprised

27

if the defense does not appear in the pleadings.  *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987).

*Hassan*, 842 F.2d at 263.  Therefore, this Court must examine the relationship between the FCN Treaty and Short's prima facie case for national origin discrimination under Title VII.[8]

A prima facie case of national origin discrimination may be proved by direct or circumstantial evidence.  *Burns v. Gadsden State Cmty. Coll.*, 1512, 1518 (11th Cir. 1990); *accord McCollum v. Amtren, Inc.*, No. 2:05-cv-1237-WKW, 2007 U.S. Dist. LEXIS 21011, at * (M.D. Ala. Mar. 22, 2007) (Watkins, J.).  Direct evidence of discrimination is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 1999) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).

A plaintiff who wishes to rely upon circumstantial evidence to support a claim of national origin discrimination must fulfill the three-step, burden-shifting analysis of

---

[8]  Short also contends that he may bring a national origin claim under § 1981.  (Doc. # 55, at 22 n. 6 (citing *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634–35 (5th Cir. 1981) (holding that, although § 1981 relates primarily to race, that national origin discrimination is "so closely related to racial discrimination as to be indistinguishable")).  Assuming that § 1981 encompasses national origin discrimination, the analysis under § 1981 would be the same as under Title VII. *Cf. McCray v. Wal-Mart Stores, Inc.*, 377 Fed. App'x. 921, 923 (11th Cir. 2010) ("Both § 1981 and Title VII 'are subject to the same standards of proof and employ the same analytical framework.'") (citations omitted); *Sims v. Coosa Cnty. Bd. of Educ.*, No. 207cv704-MEF, 2008 U.S. Dist. LEXIS 66939, at *12 (M.D. Ala. Sept. 2, 2008) (Fuller, C.J.) ("The elements of § 1981 race discrimination claim in the employment context are the same as a Title VII disparate treatment claim.") (citing *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)).

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this approach, the plaintiff must first establish that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside of his protected class or was treated less favorably than a similarly-situated individual outside his protected class."  *Maynard v. Bd. of Regents of the Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).  Once a plaintiff establishes a prima facie case of discrimination, a presumption of discrimination arises and the burden shifts to the defendant to rebut the presumption by "articulat[ing] a legitimate, nondiscriminatory reason for the challenged employment action."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000).  If the defendant does so, then the presumption of discrimination is eliminated, and the "plaintiff then bears the ultimate burden of proving [the legitimate reasons] to be pretext for . . . discrimination."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999); *see also McDonnell Douglas*, 411 U.S. at 805 ("[A Title VII plaintiff] must be given a full fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for [the adverse employment action] were in fact a coverup for a . . . discriminatory decision.").  The defendant bears only the burden of production, not the burden of persuasion, in rebutting the presumption of discrimination.  *Chapman*, 229 F.3d at 1028.

While Title VII prohibits discrimination on the basis of national origin, the FCN Treaty "permits discrimination on the basis of citizenship."  *Fortino v. Quasar Co.*, 950

F.2d 389, 391 (7th Cir. 1991) (considering a Treaty of Friendship, Commerce and Navigation between the United States and Japan which "entitles companies of each nation to employ executives of their own choice in the other one"); *see also MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1146 (3d Cir. 1988) (considering the FCN Treaty between the United States and Korea and holding that the treaty was "intended to . . . entitle a foreign business to favor personnel and prospective personnel on the basis of citizenship"); *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1059 (5th Cir. 1998) ("Courts have interpreted these provisions as granting businesses operating in the United States the right to discriminate in favor of citizens of their home countries because of their citizenship."). When seeking to prove his discrimination claims, Short bears the ultimate burden of persuading the factfinder that MAC intentionally discriminated against him because of his national origin. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff *remains at all times with the plaintiff*.") (emphasis added). In other words, if the FCN Treaty is applicable, it would be used to controvert Short's prima facie case of national origin discrimination—*i.e.* that the discrimination, if any, was based on the permissible criterium of citizenship and not the impermissible criterium of national origin. As such, it is not an affirmative defense that must be pled in MAC's answer under Rule 8(c).

For the foregoing reasons, Short's motion for a protective order and motion to

strike MAC's motion for summary judgment, (Doc. # 49), is due to be DENIED.

## II.    The Motion to Strike Evidentiary Materials (Docs. # 59, 63, 64)

Both parties have filed motions to strike various portions of the evidentiary submissions.  First, MAC filed a motion to strike all or part of Short's declaration because it was "untimely filed; contradicts his prior sworn testimony; contains hearsay, conclusory allegations, speculation, and conjecture that lack foundation; and contains other irrelevant and immaterial statements."[9]  (Doc. # 59, at 1–2).  Short has also filed a motion to strike Rolison's affidavit because it conflicts with prior sworn deposition testimony, is "riddled with inadmissible hearsay, legal opinions and references to documents neither produced nor authenticated, is "not based on . . . Rolison's personal knowledge, but on subjective belief."  (Doc. # 63, at 1).  Short's second motion seeks to strike Kwak's affidavit on the same grounds.  (Doc. # 64, at 1).

Given that the challenged declarations and affidavits were submitted in support of and in opposition to motions for summary judgment, they must comply with the

---

[9]  With respect to the first argument that the declaration was untimely filed, this Court notes that it is well aware of the situation of Short's counsel at the time the summary judgment response was due.  This Court is satisfied that the initial filing of a draft declaration was inadvertent and unintentional and that counsel promptly corrected the mistake within two days.  As such, the two-day late filing of the correct declaration constitutes excusable neglect such that this Court will not strike the entire declaration.  *Cf. Mosley v. Meristar Mgmt. Co., LLC*, 137 Fed. App'x 248, 250 (11th Cir. 2005) ("Absent an affirmative showing . . . of excusable neglect according to Fed. R. Civ. P. 6(b), a court does not abuse its discretion in refusing to accept out-of-time affidavits.") (citing *Useden v. Acker*, 947 F.2d 1563, 1571–72 (11th Cir. 1991)).

requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure.[10]   Rule 56(c)(4)

states that affidavits or declarations "used to support or oppose a motion [for summary

judgment] must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the . . . declarant is competent to testify on the matters stated."

Fed. R. Civ. P. 56(c).  The requirements of Rule 56 make it plain that declarations and

affidavits which set forth conclusory arguments rather than statements of fact based on

personal knowledge are improper.  *See, e.g., Thomas v. Ala. Council on Human*

*Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003) (Fuller, J.); *Story v.*

*Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000); *accord*

*Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).  Additionally, Rule

56(c)(4) makes clear that the facts set forth in a declaration must be those that would be

admissible in evidence—*i.e.* those that can be reduced to an admissible form.  *See*

*Macuba v. Deboer*, 193 F.3d 1316, 1324–25 (11th Cir. 1999).  Sworn statements which

fail to meet the standards set forth in Rule 56(c)(4) may be subject to a motion to strike.

*See, e.g., Thomas*, 248 F. Supp. 2d at 1112; *Givhan v. Elec. Eng'rs, Inc.,* 4 F. Supp. 2d

1331, 1334 (M.D. Ala. 1998).

However, a court need not strike an entire affidavit or declaration, rather it *may*

*strike or disregard* the improper portions and consider the remainder of the testimony or

---

[10]  Federal Rule of Civil Procedure 56(c)(4), which addresses affidavits or declarations used to support or oppose a motion for summary judgment, was formerly Rule 56(e).  Therefore, this Court will consider case law discussing the previous Rule 56(e).

statement.  *Givhan*, 4 F. Supp. 2d at 1334 n.2.  This Court will exercise its discretion to disregard any improper portions of the challenged affidavits or declaration.  Accordingly, the aforementioned motions, (Docs. # 59, 63, 64), are due to be DENIED as MOOT.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. Pro. 56(a).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[11]  *Celotex*. 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23; *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th

---

[11] "An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 943–44 (N.D. Ga. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case." *Id.* at 944 (citing *Anderson*, 477 U.S. at 248).

Cir. 1993) ("For issues, however, on which the non-movant would bear the burden of proof at trial, . . . '[t]he moving party may simply show[]—that is, point[] out to the district court—that there is an absence of evidence to support the non-moving party's case.'") (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991)).

Once the moving party has met its burden, the non-movant must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. Pro. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). *To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim. *Celotex,* 477 U.S. at 322. A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving

party's favor.  *Anderson*, 477 U.S. at 255.  After the nonmoving party has responded to

the motion for summary judgment, the court must grant summary judgment if there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of

law.  *See* Fed. R. Civ. P. 56(a).

## DISCUSSION

### I.    The Federal Claims

Short alleges race discrimination in violation of Title VII and § 1981, national

origin discrimination in violation of Title VII and § 1981, and retaliation in violation of

Title VII and § 1981.  These claims relate to three alleged adverse employment actions:

(1) Short's demotion in December of 2008 from the Quality Director position; (2) his

demotion and transfer in June of 2009; and (3) the termination of his employment in

August of 2009.  Thus, this Court will consider each employment action in turn.

### A.    The Demotion in December of 2008 from Quality Director to Director of Customer Service and Warranty

#### *i.*    Title VII: Race and National Origin Discrimination

Title VII prohibits an employer from discriminating "against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).   MAC

contends that Short's Title VII claims regarding his demotion in December of 2008 are

barred by his failure to file a timely charge with the EEOC.  (Doc. # 44, at 36, 44–45).

Under Title VII, a plaintiff in a non-deferral state, such as Alabama, must file an EEOC

charge within 180 days of when an alleged unlawful employment practice occurred.  *See*

42 U.S.C. § 2000e-5(e)(1); *Little v. Peach Cnty. Sch. Dist.*, No. , 2009 U.S. Dist. LEXIS

5443, at *11–12 n.1 (explaining that a non-deferral state is one that does not have entities

with the authority to grant or seek relief with respect to unlawful employment practices);

*see also Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir.

2005) (explaining that Alabama is a non-deferral state).  "[I]f a plaintiff fails to file an

EEOC charge before the 180-day limitations period, the plaintiff's subsequent lawsuit is

barred and must be dismissed for failure to exhaust administrative remedies."  *Thomas*,

248 F. Supp. 2d at 1115 (citing *Brewer v. Alabama*, 111 F. Supp. 2d 1197, 1204 (M.D.

Ala. 2000)).  Short concedes that he did not file an EEOC charge for this adverse

employment action within 180 days of his demotion in December of 2008.  (Doc. # 55, at

22 n.6).  As such, the motion for summary judgment, (Doc. # 43), is due to be granted

with respect to the Title VII claims stemming from Short's demotion in December of

2008.

### ii.  Section 1981: Race and National Origin Discrimination

Section 1981 makes it unlawful to discriminate on the basis of race in the making

and enforcing of contracts.  42 U.S.C. § 1981(a).  The phrase "make and enforce

contracts" includes "the making, performance, modification, and termination of contracts,

and the enjoyment of all the benefits, privileges, terms, and conditions of the contractual

relationship."  *Id.* § 1981(b).  Here, Short appears to contend that, because race

36

discrimination is often so closely related to national origin discrimination, then § 1981 encompasses separate and distinct national origin discrimination claims so long as they are brought with race discrimination claims. (Doc. # 55, at 22 n. 6 ("Short has alleged *both* race and national origin discrimination *under 42 U.S.C. § 1981*. . . . [T]he § 1981 statute of limitations and procedural framework applies to Short's *claims* of race and national origin discrimination.") (emphasis added)). Thus, this Court must first determine whether a separate and distinct national origin claim exists under § 1981.

### a.  *National Origin Discrimination Under § 1981*

Section 1981's protections do not extend to discrimination claims based "solely on the place or nation . . . of origin." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). However, "[i]n some contexts, 'national origin' discrimination is so closely related to racial discrimination as to be indistinguishable.'" *Bullard*, 640 F.2d at 634; *see also Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir. 1971) (holding that a complaint by Mexican-Americans alleging racial and ethnic discrimination, "clearly states a cause of action" under § 1981).[12] In *Bullard*, the plaintiffs brought suit pursuant to only § 1981, and the district court granted summary judgment to the defendants on the grounds that the plaintiffs had only pled a national origin discrimination claim not recognized under that statute. 640 F.2d at 633. On appeal, the Fifth Circuit reversed and held that

---

[12]  In *Bonner v. City of Prichard, Alabama*, the Eleventh Circuit adopted as binding all Fifth Circuit decisions prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). *Bullard* was entered on March 23, 1981 and is binding authority on this Court.

the plaintiff's complaint did indeed assert claims for race discrimination cognizable under § 1981. *Id.* at 634 ("[P]laintiffs do not charge only discrimination based on national origin.  In a separate paragraph of their complaint, they allege that they were discharged because of their race and their affidavits support a charge of racial discrimination equally as well as one of discrimination because of national origin.").  While Fifth Circuit noted in dicta that racial discrimination and national origin discrimination can be so closely related as to be nearly indistinguishable, it did *not* hold that there was a separate and distinct cause of action under § 1981 for national origin discrimination.  *Id.*

Rather, evidence of national origin discrimination may be highly relevant to whether or not racial discrimination in violation of § 1981 occurred.  *See Sinai v. New England Tel. and Tel. Co.*, 3 F.3d 471, 474–75 (1st Cir. 2003) (upholding a jury finding of racial discrimination—Jewish / Hebrew—under § 1981 despite defendants objections that the only evidence of discrimination was disparaging remarks about the plaintiff's national origin—Israeli—because "national origin could be used, together with other evidence, to arrive at a conclusion vis-a-vis race discrimination"); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 (10th Cir. 1997) (holding that the plaintiff's "claim of discrimination based on his Mexican-American ancestry . . . fall[s] within § 1981's protection against *racial* discrimination") (emphasis added).  Thus, to the extent that Plaintiff seeks to assert a separate and distinct national origin claim under § 1981, MAC's motion for summary judgment, (Doc. # 43), is due to granted as to that claim.  However,

this Court will consider evidence of any national origin discrimination as it relates to Short's race discrimination claim.[13]

### b.      *Race Discrimination Under § 1981*

The elements of a cause of action for race discrimination under § 1981 are "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." *Kinnon v. Arcoub Gopman & Assocs.*, 490 F.3d 886, 891 (11th Cir. 2007) (quoting *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1270

---

[13] MAC contends that Short did not properly plead race discrimination for this demotion in his Complaint and that his answers to his interrogatories did not reveal such a claim. (Doc. # 58, at 22–23).

As for the first contention, Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain a short and plain statement showing that the pleader is entitled to relief. Fed. R. Civ. P. 8. A complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) . As the Supreme Court has explained "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct. at 1949; *accord, Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009). Here, a review of the complaint reveals that Short properly pled the factual allegations underlying this claim and incorporated these factual allegations into the race discrimination count (Count 3). (Doc. # 1, at 3–8 ¶¶ 10–11, 26).

As for Short's answers to the interrogatories, this Court finds that Short did indeed include such a race discrimination claim. Interrogatory Number 14 asked Short to identify each and every instance in which he was "treated less favorably in the work place, subjected to different terms and conditions, and paid less in comparison to his *Asian* co-workers due[] to his *race*." (Doc. # 47 Ex. 5, Pl.'s Ans. to Interrogatories at 15). After discussing his time as Quality Director, Short responded, in pertinent part, that he "was demoted to Director of Customer Service." (*Id.*).

(11th Cir. 2004)).[14]  Where, as here, a plaintiff relies upon circumstantial evidence of

discrimination,[15] the *McDonnell Douglas* burden-shifting analysis applies.  *Holifield v.*

*Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997); *accord Melton v. Nat'l Dairy LLC*, 705

F. Supp. 2d 1303, 1315–16 (M.D. Ala. 2010) (Moorer, M.J.).  Under this analysis, Short

initially bears the burden of establishing a prima facie case of discrimination.  Once a

prima facie case has been shown, the defendant must rebut the presumption of

---

[14]  As previously stated, "[b]oth § 1981 and Title VII 'are subject to the same standards of proof and employ the same analytical framework.'" *McCray*, 377 Fed. App'x at 923; *Sims*, 2008 U.S. Dist. LEXIS 66939 at *12.  Thus, this Court will use Title VII and § 1981 race discrimination cases interchangeably.

[15]  Short contends that he has direct evidence of racial discrimination—*i.e.* that Kwak allegedly told him that Mando Corporation wanted a Korean to Quality Director and that he would be reporting to a Korean, although Kwak did not know who exactly.  (Doc. # 55, at 24). MAC disagrees and contends that, even if believed, this is merely circumstantial evidence of racial discrimination.  (Doc. # 58, at 20).The Eleventh Circuit has defined and explained direct evidence of discrimination as follows:

> Direct evidence is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).  As our precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Rojas v. Fla.*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2001).  If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.

*Wilson*, 376 F.3d at 1086.  Where a statement "could by inference have more than one possible meaning," it is not direct evidence of discrimination.  *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996).

Here, Kwak's alleged statements regarding having a Korean as Quality Director, even if believed, do not directly prove a discriminatory intent because they are open to multiple interpretations.  As Short contends, a reasonable jury could find that these statements referred to race vis-a-vis national origin; however, as MAC points out, a reasonable jury could infer that these statements referred to citizenship instead.  As such, Kwak's alleged statements do not constitute direct evidence, but rather circumstantial evidence.

discrimination by "articulat[ing] a legitimate, nondiscriminatory reason for the challenged employment action." *Chapman*, 229 F.3d at 1024. If the employer does so, then the burden shifts back to Short to establish that these legitimate, nondiscriminatory reasons are mere pretext for race discrimination. *Damon*, 196 F.3d at 1361; *see also McDonnell Douglas*, 411 U.S. at 805; *Campbell v. Gannett Co.*, No. 2:05-cv-615-MEF, 2006 U.S. Dist. LEXIS 49584, at *26 (M.D. Ala. July 19, 2006) (Fuller, C.J.) ("'In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reason is pretextual.'") (citations omitted).

### (1)  Prima Facie Case

Here, the parties contest whether Short has established a prima facie case of race discrimination. A plaintiff generally establishes a prima facie case of race discrimination by establishing that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside of his protected class." *Maynard*, 342 F.3d at 1289. Relying on the FCN Treaty, MAC contends that the evidence presented to this Court does not establish that the person who took over Short's duties, Ha, was treated preferentially because of his race (Asian) as opposed to his citizenship (Korean). As such, MAC contends that its actions would be protected by the FCN Treaty. In turn, Short contends that the FCN Treaty is inapplicable because MAC is an American corporation, not a Korean corporation. In

41

sum, the parties dispute whether MAC, a wholly-owned American subsidiary of a Korean company, may assert the rights of Mando Corporation under the FCN Treaty, thereby requiring Short to affirmatively prove that Ha's citizenship was not the reason for the demotion.

In *Sumitomo Shoji America, Inc. v. Avagliano*, the Supreme Court ruled that a wholly-owned American subsidiary of a Japanese company was an American company and was therefore not protected by a similar treaty with Japan.  457 U.S. 176, 182–83 (1982).  However, the Supreme Court expressly reserved ruling on whether the subsidiary could assert the treaty rights of its parents, which had not been argued.  *Id.* at 190 n.19. This Court has been unable to find any decisions in the Eleventh Circuit discussing whether a wholly-owned subsidiary may assert the rights of the parent under such treaties.

However, other courts have considered the matter and concluded that the subsidiary can invoke the parent's treaty rights if the parent corporation dictated the allegedly discriminatory conduct of the subsidiary.  *Fortino*, 950 F.2d at 393 (holding that the subsidiary may assert the parent's treaty rights where "the parent had dictated the subsidiary's discriminatory conduct"); *see also Bennett*, 138 F.3d at 1058–59 (holding that a wholly-owned subsidiary of a French corporation could invoke its parent's rights under the Convention of Establishment between the United States and France because the evidence established that the employment decisions were dictated by the parent); *Papaila v. Uniden Am. Corp.*, 51 F.3d 54, 56 (5th Cir. 1995) (holding that, "since [the subsidiary]

did not itself cause any of the discriminatory conduct, . . . [the subsidiary] may invoke its parent's Treaty rights"). *Contra Kirmse v. Hotel Nikko*, 59 Cal. Rptr. 2d 96, 101 (Cal. Ct. App. 1996) (rejecting the holdings of *Fortino* and *Papaila* because "the parent company will *always* have the power to control the management of its subsidiary" and it would be "rare" for the subsidiary to be unable to show that its foreign parent "'dictated' the employment decision question").  For purposes of this motion, this Court will assume, without deciding, that a subsidiary could assert the rights of its parent under the FCN Treaty where the parent dictates the allegedly discriminatory employment action.

Turning to the facts of this case, Short alleges that Kwak informed him of his demotion and told him that the reason was because headquarters—*i.e.* Chairman Chung and Mando Corporation—wanted to replace him with a Korean.  MAC does not really argue that Mando Corporation *actually* dictated the decision to demote Short.  Rather, MAC argues that if Short's evidence is to be believed—*i.e.* that Kwak told him that headquarters wanted a Korean as Quality Director—then it must necessarily follow that headquarters dictated the decision.  This Court disagrees.  The evidence before this Court is that Chairman Chung expressed general dissatisfaction with the communication, teamwork, and desire to succeed of all MAC executives.  Kwak agreed and assured Chairman Chung that MAC would improve its relationship with Mando Corporation. Kwak may have extrapolated and inferred from Chairman Chung's general dissatisfaction that Mando Corporation wanted a Korean as Quality Director.  However, there is no

43

evidence before this Court that anyone at Mando Corporation told that to Kwak and/or directed him to replace Short with a Korean, nor is this the case where Mando Corporation specifically sent Ha to MAC, at that time, to be the Quality Director.

The Court notes that there is a distinction to be made between what Kwak *said* Mando Corporation wanted and whether or not Mando Corporation *actually* dictated that course of action. A reasonable jury could believe that Kwak *told* Short that headquarters wanted a Korean, that this expressed a racially discriminatory motive vis-a-vis national origin, *and* that the actual decision was made by Kwak, not dictated by headquarters. A reasonable jury could also find that Kwak's alleged statement about headquarters wanting a Korean was true and that the decision was dictated headquarters. In sum, this Court finds that there are genuine issues of material fact as to what Kwak told Short at the time of his demotion and whether Mando Corporation dictated the decision to demote Short.[16] Because of these genuine issues of material fact, this Court cannot find that the FCN Treaty applies when construing the facts most favorably towards Short. Thus, this Court finds that Short has provided sufficient evidence of a prima facie case of race discrimination under § 1981.

### (2)    Legitimate, Non-Discriminatory Reason and Pretext

Because Short has presented a prima facie case of race discrimination for his

---

[16]    The parties are advised that this Court is not opposed to submitting an interrogatory to the jury regarding whether or not Mando Corporation dictated the decision to demote Short, thereby implicating the FCN Treaty.

demotion from Quality Director, MAC must rebut the presumption of discrimination by

"articulat[ing] a legitimate, nondiscriminatory reason for the challenged employment

action." *Chapman*, 229 F.3d at 1024.  Short contends that MAC failed to set forth its

legitimate, nondiscriminatory reasons with sufficient clarity for him to be able to

demonstrate pretext.  (Doc. # 55, at 27–31 (arguing that MAC implies reasons—*e.g.*

Short's attitude or character and the charge-back issue—without "provid[ing] any clear

and specific reason at all" such as by saying that Short was demoted "because of X, Y,

and Z")).  When articulating its legitimate, nondiscriminatory reasons, a defendant bears

only the burden of production.  *Crawford v. W. Elec. Co.*, 745 F.2d 1373, 1377 (11th Cir.

1984).  The employer "must articulate in a reasonably specific manner the legitimate,

non-discriminatory reasons" for its adverse employment action.  *Id.*

    This Court agrees that MAC's supposed reasons for demoting Short are vague in

the sense that MAC never explicitly says that Short was demoted for a specific reason or

reasons.  Kwak provides a narrative of alleged issues that he had with Short regarding the

charge-backs and lack of communication with Korean suppliers.  He assured Chairman

Chung that he was going to make organizational changes in response to Chairman

Chung's dissatisfaction with the teamwork, communication, and desire to succeed of all

MAC executives.  Kwak further stated that he had "no doubt in [his] mind over the basis

of Chairman Chung's unhappiness" and "knew what had to be done."  However, at no

point does Kwak state that he made *this particular organizational change* for a specific,

45

articulated reason.  Vague statements requiring a leap between Chairman Chung's

dissatisfaction and Kwak's knowing what had to be done do not sufficiently articulate the

reason or reasons for Short's demotion.  Indeed, this Court agrees with Short that one

could come up with a myriad of performance-based reasons for demoting him based on

the thirteen pages of facts provided by MAC on the issue.  It is not this Court's job, nor is

it Short's, to shift through the pages of facts and pick out all of the potential reasons

MAC could provide.[17]  For this reason, summary judgment, (Doc. # 43), is due to be

denied as to Short's § 1981 race discrimination claim regarding his demotion in

December of 2008.

However, even assuming that MAC sufficiently articulated legitimate, non-

discriminatory reasons, Short has sufficiently established pretext.  It appears to this Court

that narrative provided by MAC would supply only performance-based reasons for

Short's demotion.  Here, Short has presented sufficient evidence that any performance-

based reason for his demotion was pretextual.  *Campbell*, 2006 U.S. Dist. LEXIS 49584

at *26 ("'In order to avoid summary judgment, a plaintiff must produce sufficient

evidence for a reasonable factfinder to conclude that each of the employer's proffered . . .

reason is pretextual.'") (citing *Chapman*, 229 F.3d at 1037).  In order to show pretext, a

plaintiff must present sufficient evidence to show that the proffered reason was not the

---

[17] Indeed, even when Short objected to the lack of clarity, MAC merely stated that it articulated, "at length and in considerable detail," its legitimate reasons for demoting Short and pointed to those same thirteen pages of facts in its initial brief.  MAC again failed to say that Short was demoted for a specific reason or reasons.

real reason for the adverse employment action and that the real reason was discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason "either indirectly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 450, 256 (1981).

Here, Short disputes the extent of his responsibilities as Quality Director for the charge back issue and has, thus, created a genuine issue of material fact as to his performance of those duties.  More importantly, Short testified that, when Kwak informed him of the demotion, he stated that headquarters wanted a Korean and that, while he did not know who Short would be reporting to, it would be a Korean.  This creates a genuine issue of material fact such that a reasonable jury could find that a discriminatory motive more likely motivated the employer.  *See Williams v. Ala. Dep't of Transp.*, 509 F. Supp. 2d 1046, (M.D. Ala. 2007) (DeMent, J.) (holding that a plaintiff may show pretext by showing that "the proffered reasons did not actually motivate the employment decision"); *see also Campbell v. Civil Air Patrol*, 138 Fed. App'x 201, 203 (11th Cir. 2005) (an employer's after-the-fact, legitimate reason for taking an adverse employment action cannot be considered if that reason did not actually motivate the employer at the time of the decision).

Indeed, according to Short, Kwak made no mention of any performance-based

issues at the time he informed Short of the demotion.  When Short was demoted in June

of 2009, he reiterated in a an email to Ha that his previous demotion was not because of

"a performance issue."  The fact that Ha's response did not tell him otherwise supports

Short's contentions that he was not demoted because of his performance.  Indeed, this

email was also sent to Kwak and Rolison, and there is no evidence before this Court that

either of them informed him, at that time, that there were performance-based reasons for

his earlier demotion.  This evidence creates a genuine issue of material fact as to whether

MAC's proffered reason is worthy of credence because, if believed, it would show

weaknesses, inconsistencies, and contradictions in MAC's proffered reasons.  *See*

*Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (noting that,

when courts consider pretext, they look to "whether the plaintiff has demonstrated such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder would

find them unworthy of credence.").  In sum, even assuming that MAC sufficiently

articulated performance-based reasons for the demotion, Short has presented sufficient

evidence that such reasons are mere pretext for discrimination.  This evidence of pretext,

when considered with the prima facie case, precludes summary judgment.  For this

additional reason, MAC's motion for summary judgment, (Doc. # 43), is due to be

DENIED as to Short's § 1981 race discrimination claim regarding his demotion in

December of 2008.

**B.      The Demotion from Director of Customer Service and Warranty and Transfer to Michigan in June of 2009**

Short contends that his demotion from Director of Customer Service and Warranty and Transfer to Michigan in June of 2009 was the result of race discrimination, national origin discrimination, and retaliation.

### *i.*      Race Discrimination under Title VII and § 1981

Short again relies upon circumstantial evidence to establish race discrimination under Title VII and § 1981, so this Court will follow the familiar burden-shifting analysis of *McDonnell Douglas*.  For purposes of this motion, this Court will assume that Short has established a prima facie case of race discrimination.  Here, MAC has sufficiently articulated legitimate, nondiscriminatory reasons for its employment decision—namely, that it was seeking to cut costs given the dire economic situation and that the company would save money by having Short transfer to Michigan and take over the responsibilities of the independent contractor.[18]

Short must now establish that these legitimate, nondiscriminatory reasons are mere pretext for race discrimination.  *Damon*, 196 F.3d at 1361; *see also McDonnell Douglas*,

---

[18]  Short again contends that MAC failed to sufficiently articulate its legitimate, non-discriminatory reasons; however, this Court disagrees with respect to this employment decision. Kwak's affidavit makes clear that this employment decision was made in order to "cut costs" and because it was "a mistake" to allow Short to work out of his Tennessee home.  (Doc. # 45 Ex. 1, Kwak Aff. ¶¶ 57–59).  Indeed, the reasons provided to Short by Ha were that the employment change "stemmed from current business conditions and needs" as MAC "struggle[s] to emerge from this economic downturn" and that Short needed to be based out of Michigan "to be successful in this proposed role."  (Doc. # 47 Ex. 3, Def.'s Ex. 36 at 2)

411 U.S. at 805.  He must present sufficient evidence to show that the proffered reason was not the real reason for the adverse employment action and that the real reason was discrimination.  *St. Mary's*, 509 U.S. at 515.  Again, the plaintiff may seek to demonstrate that the proffered reason was not the true reason "either indirectly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence."  *Burdine*, 450 U.S. at 256. Here, Short points to Kwak's alleged statements regarding a discriminatory motive in demoting him from the Quality Director position six months earlier.  He also contends that the suggestion that Short would be more geographically centralized to the customers and suppliers in Michigan is false.  Finally, he argues that MAC would not save any money on travel by having him based out of Michigan.

Such evidence is insufficient to establish that MAC's proffered reasons are a mere pretext for discrimination.  With respect to Kwak's alleged statement, this Court notes that, even if believed, that statement was directed to the *particular* position of Quality Director.  As such, Short has failed to establish how this statement, made six months earlier and specifically with respect to a different position, demonstrates why MAC's legitimate reasons for this demotion are pretextual.  With respect to whether or not Short would be more geographically centralized in Michigan and whether MAC would save money by having him take over the independent contractor's position, Short merely seeks to substitute his business judgment for that of MAC.  Indeed, it is undisputed that MAC

faced a severe economic downturn and sought to cut all costs unrelated to production, and Short admitted that he was aware of the situation.  That Short disagrees with MAC's assessment of the economic situation with respect to his job as Director of Customer Service and Warranty in Tennessee is irrelevant.  *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's belief, and to be blunt about it, not on reality as it exists outside of the decision-maker's head.").  In sum, Short merely quarrels with the wisdom of MAC's reasons, without actually establishing that they are not the real reasons or that discrimination was the real reason.  Such a showing cannot establish pretext.  *See, e.g.*, *Chapman*, 229 F.3d at 1030 ("A plaintiff is not allowed to . . . substitute his business judgment for that of the employer . . . and cannot succeed by simply quarreling with the wisdom of that reason."); *see also id.* ("'[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'") (citations omitted).  Thus, the motion for summary judgment, (Doc. # 43), is due to be granted with respect to Short's Title VII and § 1981 race discrimination claims regarding his demotion and transfer in June of 2009.

> ### ii.   National Origin Discrimination under Title VII

As with race discrimination claims under Title VII, claims for national origin discrimination based on circumstantial evidence follow the burden-shifting analysis of *McDonnell Douglas*.  *See Amos v. Tyson Foods, Inc.*, 153 Fed. App'x 637, 643–45 (11th

Cir. 2005).[19]  Assuming that Short has established a prima facie case of discrimination,

this Court finds that, as discussed above for the race discrimination claims, Short has

failed to establish that MAC's legitimate, nondiscriminatory reasons are pretext for

national origin discrimination.  As such, the motion for summary judgment, (Doc. # 43),

is due to be granted with respect to Short's Title VII national origin discrimination claims

regarding his demotion and transfer in June of 2009.

### iii.    Retaliation under Title VII and § 1981

Short alleges that MAC retaliated against him for verbally complaining to Ha

about his previous demotion by further demoting him from the Director of Customer

Service and Warranty position in June of 2009.  In addition to prohibiting discrimination

on the basis of, inter alia, race and national origin, Title VII also prohibits an employer

from retaliating against an employee "because he has opposed any practice made an

unlawful employment practice by this subchapter, or because he has made a charge,

testified, or assisted, or participated in any manner in an investigation, proceeding or

hearing under this subchapter."  *Id.* § 2000e-3(a).  Section 1981 also prohibits retaliation.

*See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).  Where, as here, a plaintiff

relies upon circumstantial evidence of retaliation, the burden-shifting analysis of

---

[19]  To the extent that Short brings a separate and distinct § 1981 claim of discrimination based on national origin, MAC is entitled to judgment as a matter of law as to that claim.  As previously discussed, § 1981 does not provide for such a separate claim of national origin discrimination.  Thus, the motion for summary judgment, (Doc. # 43), is due to granted as to a § 1981 claim for national origin discrimination with regard to Short's demotion and transfer in June of 2009.

*McDonnell Douglas* applies.  *Id.*  For the reasons discussed above regarding the race and national origin discrimination claims for this demotion, this Court finds that Short has failed to establish that MAC's legitimate, nondiscriminatory reasons were mere pretext for retaliation.  As such, the motion for summary judgment, (Doc. # 43), is due to be granted with respect to Short's Title VII and § 1981 retaliation claims regarding his demotion and transfer in June of 2009.

### C.    The Termination of Short's Employment in August of 2009

Short contends that his termination in August of 2009 was the result of race discrimination, national origin discrimination, and retaliation.

### *i.*    Race Discrimination under Title VII and § 1981

Because Short relies upon circumstantial evidence to establish race discrimination under Title VII and § 1981, this Court is to follow the familiar burden-shifting analysis of *McDonnell Douglas*.  For purposes of this motion, this Court will assume that Short has established a prima facie case of race discrimination.  In turn, MAC has sufficiently articulated legitimate, nondiscriminatory reasons for its employment decision—namely, that Short refused to accept the terms and conditions of his relocation to Michigan.[20]  In

---

[20]  Short again contends that MAC failed to sufficiently articulate its legitimate, non-discriminatory reasons.  This Court disagrees.  Kwak's affidavit sufficiently makes clear that the employment decision was made because Kwak "concluded that [Short] was not willing to accept [MAC's] offer of continued employment." and that the termination occurred "when . . . Short did not accept the terms of the relocation that MAC offered to provide"  (Doc. # 45 Ex. 1, Kwak Aff. ¶¶ 59, 65).  Indeed, the reasons provided to Short by Rolison were that they "were unsuccessful in reaching a mutually acceptable relocation package."  (Doc. # 47 Ex. 3, Def.'s Ex. 64 at 1).

seeking to establish pretext, Short contends that he positively and affirmatively accepted

the new position.  However, the undisputed evidence before this Court is that, while Short

may have "accepted" *the position*, nothing before this Court demonstrates that he

accepted the *terms and conditions of the relocation* to Michigan.[21]  Even assuming, as

Short contends, that MAC changed the terms of the relocation package by moving up the

permanent relocation date and refusing to cover business related expenses beginning in

August, the undisputed evidence establishes that Short repeatedly and strenuously

asserted that he could not move to Michigan without selling his Tennessee home, that the

$10,000 for miscellaneous moving expenses was not enough, and that he needed a three-

year employment contract.  In reality, Short merely quarrels with the business decisions

made by MAC with respect to the terms of Short's relocation package.  While he may

believe that his articulation of his needs was reasonable, "pretext centers on the

employer's beliefs, not the employee's belief, and to be blunt about it, not on reality as it

exists outside of the decision-maker's head." *Alvarez*, 610 F.3d at 1265.  In sum, Short's

---

[21]  Short also argues that Kwak, in his affidavit, "blatantly admits that he actually made
the decision not to continue Short's employment 'in early July'" which he claims "casts
significant doubt on everything about MAC's July emails and the entire process of 'negotiation'
about the changing terms of Short's demotion." (Doc. # 55, at 64–65 (citing Doc. # 45 Ex. 1,
Kwak Aff. ¶¶ 64–65).  In reality, Kwak merely stated that he "made the decision concerning the
*terms* of his continuing employment in early July." (Doc. # 45 Ex. 1, Kwak Aff. ¶ 64) (emphasis
added).  This is not a blatant admission that Kwak had decided to terminate Short in early July.
It is merely a statement that, consistent with the emails between Short and Rolison, the terms of
the relocation package and, thus, Short's continued employment were set in early July.  Once
Short evidenced that he would not or could not accept those terms, then the decision to terminate
his employment necessarily followed. (*Id.* ¶ 65).

evidence is insufficient to establish pretext. *See Chapman*, 229 F.3d at 1030 ("A plaintiff is not allowed to . . . substitute his business judgment for that of the employer . . . and cannot succeed by simply quarreling with the wisdom of that reason."). As such, the motion for summary judgment, (Doc. # 43), is due to be granted as to Short's race discrimination claims under Title VII and § 1981 for his termination in August of 2009.

### ii.     National Origin Discrimination under Title VII

As discussed above, Short has failed to establish that MAC's legitimate, nondiscriminatory reasons for terminating his employment were pretext for discrimination.[22] Thus, the motion for summary judgment, (Doc. # 43), is due to be granted with respect to Short's Title VII national origin discrimination claims regarding his termination in August of 2009.

### iii.     Retaliation under Title VII and § 1981

Short alleges that MAC terminated his employment in retaliation for his complaining to Rolison and other MAC employees about discrimination, complaining to management via email on June 19, 2009, and for filing his EEOC charge on July 30, 2009. Because Short has failed to establish that MAC's legitimate nondiscriminatory reasons are pretextual, the motion for summary judgment, (Doc. # 43), is due to be

---

[22] To the extent that Short brings a separate and distinct § 1981 claim of discrimination based on national origin, MAC is entitled to judgment as a matter of law as to that claim. As previously discussed, § 1981 does not provide for such a separate claim of national origin discrimination. Thus, the motion for summary judgment, (Doc. # 43), is due to granted as to a § 1981 claim for national origin discrimination with regard to Short's termination in August of 2009.

granted with respect to Short's Title VII and § 1981 retaliation claims regarding the termination of his employment in August of 2009.

## II.     The State-Law Claims

In his Complaint, Short alleges the state-law torts of intentional infliction of emotional distress, also known as the tort of outrage, and negligent and wanton hiring, training, supervision, and retention.  MAC contends that Short cannot establish a prima facie case for these claims.

### A.     Intentional Infliction of Emotional Distress

To establish intentional infliction of emotional stress, also known as the tort of outrage, under Alabama law, a plaintiff must demonstrate "that [the defendant's] conduct was '(1) intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1043 (Ala. 1993)).  However, this tort "does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other triviliaties.'" *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d).  Rather, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Id.* (citing Restatement (Second) of Torts § 46 cmt. d).

Indeed, both the conduct complained of and the emotional distress caused by it

must be extreme, a standard which has been "strictly" applied by the Supreme Court of

Alabama.  *Saville v. Houston Cnty. Healthcare Auth.*, 852 F. Supp. 1512, 1541 (M.D.

Ala. 1994) (Thompson, J.) (citations omitted).  Thus, "[o]utrage is a very limited cause of

action that is available only in the most egregious circumstances."  *Thomas*, 624 So.2d at

1044 (Ala. 1993) (citing nineteen cases for support that the Alabama Supreme Court "has

held in a large majority of the outrage cases that no jury question was presented"); *accord*

*Thornton v. Flavor House Prods.*, No. 1:07-cv-712-WKW, 2008 U.S. Dist. LEXIS

103099 at *61 (M.D. Ala. 2008) (Watkins, J.).  As such, the Alabama Supreme Court has

allowed such claims only in three limited circumstances: "cases having to do with

wrongful conduct in the context of family burials; cases where insurance agents employed

heavy-handed, barbaric means to coerce a settlement; and cases involving egregious

sexual harassment." *Carter v. Harris*, 64 F. Supp. 2d 1182, 1194 (M.D. Ala. 1999);

*accord Thomas*, 624 So.2d at 1044.

  Here, Short bases his tort of outrage claim on the alleged race and national origin

discrimination as well as the alleged retaliation.  However, this Court agrees with MAC

that such claims do not fall within the three limited circumstances recognized by the

Alabama Supreme Court for the tort of outrage.  This Court further finds that Short has

failed to present evidence that MAC's conduct, through Kwak, Rolison, and Ha, was "so

outrageous in character and so extreme in degree as to go beyond all possible bounds of

decency, and to be regarded as atrocious and utterly intolerable in a civilized society."

*Harrelson*, 882 So. 2d at 322.  Indeed, even if Short had established that MAC's conduct was extreme and outrageous, he has put forward insufficient evidence to show that his emotional distress was extreme, as required under Alabama law.  *Saville*, 852 F. Supp. at 1541; *see also Continental Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1211 (Ala. 1990) ("The emotional distress must be so severe that no reasonable person could be expected to endure it.").  For these reasons, the motion for summary judgment, (Doc. # 43), is due to be granted as to Short's tort of outrage claims.

### B.    Negligent and Wanton Supervision, Hiring, and Retention

Under Alabama law, "[a] party alleging negligent or wanton hiring, supervision, training, and retention must prove the underlying wrongful conduct of employees." *Thornton*, 2008 U.S. Dist. LEXIS 103099 at *67 (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003)); *accord Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008).  Furthermore, the underlying wrongful conduct must constitute "'a common-law, Alabama tort' committed by the employee, not on a federal cause of action such as Title VII." *Ellis v. Advanced Tech. Servs.*, No. 3:10-cv-555-WHA, 2010 U.S. Dist. LEXIS 92279, at *6 (M.D. Ala. Sep. 3, 2010) (Albritton, J.) (quoting *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)); *accord Rabb v. Georgia Pacific, LLC*, No. CA 09-0420-C, 2010 U.S. Dist. LEXIS 75094, at *64 (S.D. Ala. July 26, 2010) ("Because Alabama does not recognize a common-law tort for race discrimination in employment, this Court finds that [the

plaintiff] cannot maintain an action for negligent supervision based on conduct that is employment discrimination, but does not support a common law tort.").  Because MAC is entitled to judgment as a matter of law on Short's state-law claims for intentional infliction of emotional distress and because Short has alleged no other state-law torts, the motion for summary judgment, (Doc. # 43), is due to be granted as to Short's claims for negligent and wanton supervision, hiring, and retention.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that:

1.  Short's motion for a protective order and motion to strike MAC's motion for summary judgment, (doc. # 49), is DENIED;

2.  MAC's motion to strike portions of Short's evidentiary submission submitted in opposition to MAC's motion for summary judgment, (Doc. # 59), is DENIED as MOOT;

3.  Short's motion to strike Rolison's affidavit, (Doc. # 63), is DENIED as MOOT;

4.  Short's motion to strike Kwak's affidavit, (Doc. # 64), is DENIED as MOOT; and

5.  MAC's motion for summary judgment, (Doc. # 43), is DENIED as to Short's § 1981 race discrimination claims regarding his demotion in December of 2008 and GRANTED in all other respects.

DONE this the 1st day of August, 2011.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE